[Nos. 20822, 20823.   Department One.   January 12, 1928.]

THE FIRST NATIONAL BANK OF SEATTLE, *Respondent,* v. CLYDE WALTON *et al., Appellants.*

THE FIRST NATIONAL BANK OF EVERETT, *Respondent,* v. CLYDE WALTON *et al., Appellants.*[1]

[1] CORPORATIONS (147) — CORPORATE POWERS — HOLDING STOCK IN OTHER CORPORATIONS—CORPORATE IDENTITY. The fact that all of the stock of a sales corporation, organized to handle the product of a lumber company, was held by the latter, and that the two were closely affiliated and conducted by the same officers and in the same office, does not warrant a holding that there was but one identity, upon the theory that the subsidiary was a mere agency and instrumentality of the parent corporation, in fraud of the rights of creditors, where the sales corporation paid full value for the stock in trade, at a time when the mill company was solvent thereby enabling it to pay all its debts, and it is not made to appear that their property rights are so commingled or their affairs so intimately related that they are one, in fact and intent, and it appears that to otherwise regard them would work a fraud upon third persons.

Appeals from judgments of the superior court for Skagit county, Joiner, J., entered July 14, 1927, upon findings in favor of the plaintiffs, in consolidated actions upon contracts, tried to the court. Affirmed.

¹Reported in 262 Pac. 984.

*Bogle, Bogle & Gates, Cassius E. Gates, Thomas Smith,* and *Edward G. Dobrin,* for appellants.

*Horan & Mulvihill* and *Chadwick, McMicken, Ramsey & Rupp,* for respondent.

PARKER, J.—The plaintiffs, Seattle and Everett banks, separately, on the same day, commenced these actions in the superior court for Skagit county, seeking recovery from the defendant, Clear Lake Sales Corporation, upon certain promissory notes evidencing a separate indebtedness owing by it to each of the banks in an amount of approximately $43,000. The interveners, Walton and Moody, as receivers of the insolvent Clear Lake Lumber Company, by their separate complaints, intervened in each of the actions; being permitted to do so by orders of the court, upon the theory that the lumber company and the sales corporation are, in fact, one concern, all of the property and assets of which are subject to administration by the interveners, as receivers, in the interest of all creditors of both the lumber company and the sales corporation as a single insolvent concern; that the banks are indebted to such concern, for which judgment is asked against them; and that the banks, in no event, have greater rights than as common creditors of such single insolvent concern.

The cases were consolidated for the purpose of trial, and proceeded to trial before the court sitting without a jury. The trial resulted in findings and judgment awarding to each of the banks recovery against the defendant sales corporation, as prayed for by them; also judgments awarding to each of the banks recovery against The First National Bank of Mt. Vernon, as garnishee defendant in each action, for the sum of $25,944, the aggregate of these garnishee judgments being the amount standing to the credit of the sales

corporation upon its deposit account with that bank; and denying to the interveners all the relief prayed for by them. From each of these final dispositions of the cases in the superior court, the interveners have appealed to this court, and the controlling facts and law being common to each case, the appeals are here presented together by agreement of all parties.

The controlling facts, as we view them, may be fairly summarized as follows: The banks, as national banks, have been, since long prior to the commencement of the negotiations and transactions here in question, engaged in banking business at Seattle and Everett, respectively. The Clear Lake Lumber Company, a domestic corporation, during the same period, up until its passing into the hands of receivers because of its insolvency, was engaged in logging and sawmill operation and business, owning timber lands and a mill plant of considerable magnitude. In September, 1924, the lumber company, apparently, was unable to financially carry on its business as advantageously as those in charge of its affairs desired, particularly in the marketing of its output, in that it was unable to obtain a line of banking credit sufficient to that end. Those in charge of the lumber company's affairs then conceived the idea of organizing an independent sales corporation; this with a view of disposing of its output to such new corporation, and the lumber company confining its energies to the physical production of its output and be relieved of the necessity of marketing its output through the ordinary channels of trade. The banks had then expressed themselves as tentatively willing to finance such a new corporation to the extent of giving it a line of banking credit to the extent of $100,000 in each bank. Accordingly, on October 2, 1924, the Clear Lake Sales Corporation was duly incorporated under the laws of this state with a stated

capital of $250,000, consisting of 2,500 shares of the par value of one hundred dollars each. The lumber company subscribed for 2,494 shares of the capital stock of the sales corporation, the other shares being subscribed for by those who became officers of the new corporation.

On October 9, 1924, the lumber company, by its bill of sale duly executed and recorded, conveyed to the sales corporation all of the saw logs at its mill and yards and all lumber, shingles and lath then at its mill and yards. Part of the consideration for this conveyance was the $249,400 for which the lumber company had become indebted upon its stock subscription to the sales corporation. The value of the logs, lumber, lath and shingles so conveyed was not over $450,-000, probably substantially less than that amount, so that the sales corporation became indebted to the lumber company by that transaction in the sum of approximately $200,000. About the same time, the banks each loaned to the sales corporation $100,000, in all $200,000. This sum, so borrowed by the sales corporation, was paid, or caused to be paid by it, to the lumber company within a short time after the execution of the bill of sale from the lumber company to the sales corporation, and was considered as full payment of the balance due from the sales corporation to the lumber company.

On October 14, 1924, in pursuance of a prior tentative understanding between the parties, a contract was entered into between the sales corporation and the banks, by which the banks agreed to extend to the sales corporation a line of banking credit to the extent of not exceeding $100,000 in each bank, to be evidenced by promissory notes running for ninety day periods, payable and renewable from time to time as the necessity of the sales corporation might require; it being

recited in the contract that the sales corporation then had quick assets of the value of $450,000, evidently being at that time the property conveyed to it by the lumber company by the bill of sale above noticed; and was indebted not to exceed $200,000, the amount then owing by it to the banks, and agreeing that its ratio of indebtedness to its quick assets should be maintained at that ratio, the banks to have the privilege of having a man acting for them to examine the books and business of the sales corporation at any time they desired such examination to be made; the contract also reciting that the sales corporation was to enter into a contract with the lumber company for the manufacturing of its logs into lumber by the lumber company. On October 15, 1924, the sales corporation entered into a contract with the lumber company for the manufacture of its logs into lumber, shingles and lath by the lumber company; it evidently being contemplated that the lumber company would not only manufacture for the sales corporation the logs which had been sold to it by the lumber company according to the bill of sale above noticed, but also other logs which the sales corporation might acquire and furnish for manufacturing into lumber by the lumber company.

On August 12, 1925, the lumber company passed into the hands of receivers who continued to carry on business with the sales corporation in pursuance of the above noticed contract until February 9, 1926, at which time these interveners became receivers of the lumber company. This occurred in a subsequent action brought against the lumber company, which was consolidated with the former action in which the former receivers were appointed, and thereafter these interveners were, and continue to be, permanent receivers administering the affairs of the insolvent lumber company. The

notes here sued upon, and upon which recovery was awarded, were executed in April and May, 1926.

The trial court found, among other things, as follows:

"That the officers and trustees of the lumber company were practically the same, and that the said sales corporation had no office or place of business, except that of the lumber company, and that the stock of lumber, logs, lath, shingles and shingle bands, above referred to, remained at all times upon the premises of the lumber company, but that the said sales corporation, at all times after the execution of said bill of sale, exercised all acts of ownership and control over said stock of lumber, logs, lath, shingles and shingle bands. . . .

"That at all times, subsequent to the organization of said sales corporation, said sales corporation kept books of account, carried bank accounts in its own name, carried on its business of purchasing logs, selling lumber, lath, shingles and shingle bands, and sold, shipped and invoiced in the name of said sales corporation, lumber, lath, shingles and shingle bands, borrowed money on its notes, and pledged as security for its notes, invoices and bills of lading of lumber sold, and in all respects carried on and conducted its business as a corporation entirely separate and apart from that of said lumber company.

"That at the time of the sale of said stock of logs, lumber, lath, shingles and shingle bands, by said lumber company to said sales corporation, the assets of the lumber company exceeded its liabilities and it had on hand current assets substantially equal in amount to its current liabilities, and that the two hundred thousand ($200,000.00) dollars paid by the said sales corporation to the lumber company was more than sufficient to pay all of the then overdue liabilities of the lumber company, and that the said two hundred thousand ($200,000.00) dollars was applied by said lumber company to the payment of its debts."

These findings, we think, are well supported by the evidence.

Counsel for the intervening receivers invoke the general rule, as stated in our decision in *Platt v. Bradner Co.,* 131 Wash. 573, 230 Pac. 633, as follows:

"While, in general, a corporation is a separate legal entity, nevertheless when one corporation so dominates and controls another as to make that other a simple instrumentality or adjunct to it, the courts will look beyond the legal fiction of distinct corporate existence, as the interests of justice require; and where stock ownership is resorted to not for the purpose of participating in the affairs of the corporation in the customary and usual manner, but for the purpose of controlling the subsidiary company so that it may be used as a mere agency or instrumentality of the owning company, the court will not permit itself to be blinded by mere corporate form, but will, in a proper case, disregard corporate entity, and treat the two corporations as one."

[1] We are unable to see that "the interests of justice require" that these two corporations should be adjudged to be, in legal effect, one, in so far as the rights of the parties to this controversy are concerned. True, they were intimately associated in a business way to the extent that the interest of one became largely the interest of the other and their managing officers were practically the same, but they were carried on as wholly separate concerns, in so far as their respective property rights were concerned. There was no commingling of their funds or property interests. They each kept wholly separate books of account. The physical possession of their respective properties was kept separate to the extent of ready ascertainment. True, the logs and lumber of the sales corporation were at the mill and yards of the lumber company, but only for the purpose of manufacture and temporary storage. There was no such physical commingling of the logs and lumber at the yards and mill of the lumber com-

·pany as to, in the least, impair identification of the logs and lumber of the sales corporation.

Nor can we see that this manner of doing business and the mutuality of interest of these corporations worked to the prejudice of the lumber company or its creditors. Indeed, this record furnishes some ground for arguing that the arrangements between these two corporations worked to the advantage of the lumber company and its creditors. It received full and fair consideration, for the logs and lumber it originally parted with, by receiving the fully paid up stock of the corporation and the $200,000 in cash from that corporation, at a time when the lumber company was solvent, at all events solvent upon so acquiring that stock and that $200,000 in money. Now, it is not enough to call for adjudicating two corporations to be in legal effect one, that it merely appear that one is the owner of practically all of the stock of the other, and that they are very intimately related in jointly carrying on their business for the purpose of mutual benefit. It must also appear that their property rights are so commingled and their affairs so intimately related in management as to render it apparent that they are, in fact and in intent, one, and, so related, to have them regarded otherwise would work a fraud upon third persons. Clearly, we think these two corporations are not so united in interest or so operated. In *Erkenbrecher v. Grant*, 187 Cal. 7, 200 Pac. 641, in a well considered opinion, Justice Shurtleff, speaking for the court, makes this very pertinent observation:

"In order to cast aside the legal fiction of distinct corporate existence as distinguished from those who own its capital stock, it is not enough that it is so organized and controlled and its affairs so managed as to make it 'merely an instrumentality, conduit or adjunct' of its stockholders, but it must further appear

that they are the 'business conduits and alter ego of one another,' and that to recognize their separate entities would aid the consummation of a wrong. Divested of the essentials which we have enumerated, the mere circumstance that all the capital stock of a corporation is owned or controlled by one or more persons does not, and should not, destroy its separate existence; were it otherwise, few private corporations could preserve their distinct identity, which would mean the complete destruction of the primary object of their organization.

"There is abundant authority in addition to the cases we have mentioned, sustaining our view of the law. Indeed, our attention has not been directed to a case holding the contrary. While some text-books contain passages pointing to a different conclusion, an examination of the cases cited by the author demonstrates that they not only do not support the text, but are predicated upon a version of the law similar to the one herein declared. Likewise, some of the decisions contain passages which, when taken alone, lend some basis for a different interpretation, but, when read in the light of the facts of the case, which is always essential when construing and applying judicial expressions, it is clear there was present the demand that corporate entity be ignored in order that fraud or some kindred wrong be defeated."

In *Berkey v. Third Avenue Railway Co.*, 244 N. Y. 84, 155 N. E. 58, Judge Cardozo, speaking for the court, in his usual illuminating language, said:

"The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an 'alias' or a 'dummy.' All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act

of operation. Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice (Ballantine, Parent & Subsidiary Corporations, 14 Calif. Law Review, 12, 18, 19, 20). The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law (*Chicago, etc., Ry. Co. v. Minn. Civic Assn.*, 247 U. S. 490; *United States v. Reading Company*, 253 U. S. 26, 61, 63). At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form. We find in the case at hand neither agency on the one hand, nor on the other abuse to be corrected by the implication of a merger.''

It is worthy of note, in this connection, that by the law of this state we have express statutory authority for one corporation subscribing for and owning stock in another corporation. Rem. Comp. Stat., § 3810 [P. C., § 4510]. Thus, it would seem that the lumber company's subscribing for and owning practically all of the stock of the sales corporation is of but small moment as pointing to the united legal entity of the two corporations, in the absence of clear showing of such commingling of property interests and united management as worked a fraud prejudicial to the rights of third persons.

The judgments are affirmed.

MACKINTOSH, C. J., TOLMAN, MITCHELL, and FRENCH, JJ., concur.