[No. 24512.   *En Banc.*   October 24, 1933.]

E. H. SOMMER *et al., Respondents,* v. YAKIMA MOTOR
COACH COMPANY *et al., Appellants,* GLOBE &
RUTGERS FIRE INSURANCE COMPANY
*et al., Respondents.*

D. S. SPRINKLE *et al., Respondents,* v. YAKIMA MOTOR
COACH COMPANY *et al., Appellants.*[1]

[1]Reported in 26 P. (2d) 92.

*Bogle, Bogle & Gates, Ray Dumett, Bundy & Swale,* and *Bushnell & Beardsley,* for appellants.

*Bruce E. McGregor* and *Moulton & Powell,* for respondents.

*Cleland & Clifford, amicus curiae.*

STEINERT, J. — Two different sets of plaintiffs brought separate actions to recover damages resulting from the destruction of a garage building and certain of its contents by fire alleged to have been communicated from an over-heated stage that had been parked in the garage overnight. The plaintiffs Sommer, who operated the garage, sought to recover for the destruction of their general garage equipment and tools, their stock of merchandise, two automobiles, and the business theretofore conducted by them. The plaintiffs Sprinkle, owners of the garage building, sought to recover for the destruction of the building itself and one automobile. The cases were consolidated for trial, but separate verdicts were returned. Motion for judgment notwithstanding the verdict was interposed in each case and overruled by the court. Motions for new trial were likewise overruled, conditioned upon the acceptance by the plaintiffs of certain reductions. The reductions having been accepted,

judgments upon the verdicts were entered, from which defendants appeal.

The two cases have been consolidated in this court. The claims of the interveners are, so far as the appeal is concerned, merged in one of the judgments, and therefore no further reference will be made either to those claims or to the interveners. For the sake of convenience, we will refer to the appellant Yakima Motor Coach Company, as "the Yakima company" and to the appellant Washington Motor Coach Company as "the Washington company."

The assignments of error, twenty-two in number, are grouped under four principal contentions. The facts, so far as it may be necessary to relate them, will be set forth according to, and as we discuss, the separate contentions.

Appellants' first contention is that the evidence fails to establish that the fire was caused by the negligence of the Yakima company, which controlled the operation of the stage. The facts in this connection, as we think that the jury was entitled to believe and accept them, are as follows:

Early in the evening of Thanksgiving day, 1929, a stage, owned by the Washington company, but leased for the time being to the Yakima company, was being operated by the latter's employee and driver between Yakima and Prosser. The stage had been traveling very fast, and the motor apparently had become overheated. At a point about a mile from the depot in Prosser, one of the passengers observed a blaze coming through the floor of the stage. The driver's attention was called to this, whereupon he stopped the stage, permitting the passengers to disembark and remain outside while he put out the fire with a Pyrene extinguisher. The stage then proceeded on towards Prosser, but in a few minutes the fire again broke out,

and was again extinguished by the driver. There were several recurrences of the fire within the distance of a mile, requiring the application of the extinguisher.

When the stage arrived at the depot in Prosser, which was the end of the run, the blaze had again appeared, and with seemingly greater intensity than before. Here the passengers, having ended their journey, left the stage, and the driver, after again using the extinguisher, proceeded on alone to the Sommer garage where he customarily parked the stage overnight. This was about five minutes after nine o'clock in the evening. When the driver left the garage, after parking the stage, there was no one present on the premises, with the possible exception of a man whose identity has never been established and whom no one, save the driver, saw that evening.

The garage building was about fifty feet in width and one hundred feet in length, the front of the building facing north. The floor was of concrete and the walls, fourteen feet in height, were of brick, surmounted by a wooden roof covered with a tar composition. Across the room, from east to west, fifty-six feet from the front of the building, ran a wooden partition having an equal height with the walls, and above the partition extending to the roof was plasterboard. Near the middle of the partition was a sliding door about nine feet in width; to one side of this was a smaller door. In the northeast corner of the building was an office, the inner walls of which were of wooden construction. There were thus three compartments in the building, an office, a storage room in front of the partition, and a repair shop in the rear. In the southeast corner of the storage room was a lavatory about seven feet high and open at the top, with three of its walls composed of wood. Heat was supplied to the building

by means of three stoves, one in each of the three main compartments.

The lighting system in use was electrical, the wiring being what is designated as "open tube wiring." Insulated wires entered the building from the outside and traveled through porcelain posts set into the cross-beams, thus preventing contact between the wires and the wooden beams. At convenient places were the usual droplights. Wherever it was necessary for the wires to pass through the wooden partition, holes about four inches in diameter were cut, allowing the wires to pass through the center. In addition to the electric lighting system, the owner had also installed a gasoline lighting plant, consisting of a tank outside the building and a hollow wire conduit leading inside.

The garage was used for both storage and repair work. A number of people, including the Yakima company, customarily kept their cars or trucks in the storage room, and for their convenience were given keys so that they might come and go as they pleased after the garage was closed for the night.

The stage arrived at the garage at about 9:05 p. m., its usual time, and was parked along the center of the floor with its front projecting through the larger door in the partition. Ranged about the walls of the garage were about ten automobiles and one or two trucks that had come in on their own power; in the repair shop were two automobiles.

There was no direct evidence as to how the fire started, there being no eyewitness. At about eleven o'clock p. m., a number of individuals at different points in the town saw the fire shooting up through the center of the roof. This, it will be observed, would be at a point just above the partition through which the stage extended below. The alarm was turned in, and shortly thereafter entry to the garage was effected

through the front door. The density of the smoke at first concealed the fire within the building, but as the air formed a current the fire appeared to be raging around and over the truck and up along the partition through the roof. At that time, there was no fire in the front part of the building.

By the time that the fire was finally extinguished, the garage had been practically destroyed. Although the walls were left standing, they were, from a practical standpoint, beyond repair. Some of the automobiles stored within were almost entirely destroyed; others were only slightly damaged. The stage was very badly burned. Certain parts of the chassis were melted and completely ruined; other parts, however, were salvaged and later used and installed in other machines.

There was a good deal of evidence on the part of appellants that was at variance with the evidence which forms the basis of our narrative, thus presenting questions of fact for the jury to determine and invoking the element of credibility.

█ It is the contention of appellants that all the evidence of respondents concerning the claimed negligence of the stage driver and the asserted causal connection between his negligence and the fire was purely circumstantial; and that it was therefore respondents' duty to establish by clear proof that the circumstances all concurred to prove that the fire occurred in the manner alleged, and further, to prove that those circumstances were inconsistent with any other rational conclusion. According to the opinion given by an expert witness for the appellants, the fire was occasioned by one or more of the following probable causes: (1) one of the three stoves; (2) the electric wiring; (3) a cigarette thrown among accumulated

papers in the lavatory; (4) the gasoline lighting system; (5) sparks on the roof.

With reference to these asserted causes, there was evidence on the part of the respondents (1) that there was no fire in the stoves; (2) that the electric wiring was in good condition, or at least that there was no indication of any defect that might cause a short circuit, and that the wires were removed from any possible contact with any inflammable material; (3) that there was no paper on the floor of the lavatory that could reasonably have been ignited by a cigarette; (4) that the gasoline lighting system was not in use, and further, was dry of gasoline. As to sparks falling on the roof, there was no evidence whatever from which any inference at all could be drawn that such was the cause.

In passing, it may be observed that appellants' expert witness gave it as his opinion that the fire originated in the lavatory. It is argued by appellants that, since the fire was not seen issuing through the roof until two hours had elapsed after the stage had been parked in the garage, there could therefore be no reasonable inference that the fire was communicated from the stage. In this connection, however, it is to be said that even appellants' expert witness testified that a fire originating in the lavatory might not, in the absence of an air current, be expected to gain its full intensity under several hours. This, in his opinion, would be the time necessary for a fire, originating through a lighted cigarette tossed among papers in the lavatory, to burn upward along and over the partition into the roof.

Appellants bottom their contention mainly upon the authority of *Chilberg v. Colcock*, 80 Wash. 392, 141 Pac. 888, and *Parmelee v. Chicago, M. & St. P. R. Co.*, 92 Wash. 185, 158 Pac. 977, wherein the rule is laid

down, generally, that, in proving a case by circumstantial evidence, it is not sufficient merely to show that there were causes for which the other party could be liable and which *could* have produced the injury, but there must be a showing that the injury could not have been produced in any other manner, or could not have been produced in a manner for which such party would not be liable. That such is the rule in the abstract it may be conceded, but the rule is not so extensive or so rigid as to require the exclusion of every possibility, whether it be an active cause or a mere condition. For instance, the accumulation of paper in the lavatory might be a condition, but unless connected with an active force, such as a lighted match or cigarette, it could never of itself become a probable cause. The electric wiring in itself was also a condition, but, unless brought into contact with some substance which would produce a short circuit, it could not become an active cause.

The same is true of the other theories or suppositions advanced by appellants. They were conditions, it is true, and might have become causes if some active force were applied in such a way as to convert their latency into an activity. But possible, or probable, causes do not mean mere conjectures or speculative suggestions of possible causes. If such were not the effect of the rule, there could hardly ever be a case where negligence and consequent liability could be established by circumstantial evidence, for it would be easy to advance some theory not wholly barren of reason, but which in the very nature of things it would be impossible to meet with proof. It would even compel the claimant to conceive and eliminate possible sources that were in themselves indeterminate and unascertainable.

There are many decisions by this court which lay

down, or point to, the true rule obtaining under circumstances kindred, or similar, to those in the present case. In *Abrams v. Seattle & Montana R. Co.,* 27 Wash. 507, 68 Pac. 78, action was brought to recover damages resulting from a fire alleged to have been caused by sparks from a passing engine. The proof rested wholly in circumstantial evidence. It was said, p. 512:

"The respondent was not obligated to prove these facts by the direct evidence of an eye witness, nor by proofs which would leave them beyond the possibility of a doubt. It was sufficient if he established them by the proof of circumstances which lead reasonably to their inference, and which ordinarily satisfies an unprejudiced mind of their truth."

In *Dumas v. Walville Lbr. Co.,* 64 Wash. 381, 116 Pac. 1091, the plaintiff sustained an injury through the falling of a pile of lumber. It was contended by the defendant that, under the facts, there were so many things that might have caused the lumber to fall that the solution of the question was merely a matter of guess. In answer to that contention, the court said, p. 385:

"In view of the evidence, it seems to us that counsel has confused the ideas of credibility and conjecture. If we are to hold the rule against speculation and conjecture as applicable to this case, then on a mere suggestion, or slight evidence of conflicting theories, it could be successfully invoked in almost any case. The question here presented is really one of credibility of evidence."

In *Sweeten v. Pacific Power & Light Co.,* 88 Wash. 679, 153 Pac. 1054, damages were sought to be recovered for the death of a child through electrocution by a wire that ran through the upper branches of a tree, into which children had been in the habit of climbing.

The case rested entirely upon circumstantial evidence. It was there said, p. 682:

"The cause of an accident, like any other fact, may be proven by circumstantial evidence. Here a sufficient cause of the accident was shown, coupled with circumstances strongly indicating that it was the real cause. The accident was sufficiently accounted for as resulting from contact with the uninsulated wire. It was not incumbent upon respondent to negative every other possible cause. Proof of the exposed condition of the wire, its contact with the tree, the custom of the children to climb the tree at this period of the year, and the finding of the boy at the foot of the tree bearing upon his body fresh electrical burns, made a *prima facie* case which could only be overcome by proof that the death of the child resulted from some other cause. The respondent was not required to prove the cause of the accident beyond a reasonable doubt, but only by a preponderance of the evidence. It is true, as we have often held, a verdict may not rest upon pure speculation, but the correlative is also true that a verdict resting upon competent evidence may not be set aside upon pure speculation."

In *Hinckley v. Shell Co. of California,* 127 Wash. 630, 221 Pac. 594, wherein damages for a fire loss were sought to be recovered, it was urged that the evidence was insufficient to take the case to the jury, and in answer to that contention it was said, p. 632:

"We are unable to agree with the appellant's contention that the evidence was insufficient to justify the case being submitted to the jury or to support its verdict because, as it argues, it did not point to appellant as the cause of the fires. It may be true that the mere fact that sparks came, from time to time, from appellant's smokestack would be insufficient. But the law does not impose upon the respondent the duty of presenting direct and positive testimony concerning the source of the fire."

The party seeking to recover damages because of the negligence of another must establish with reason-

able certainty that the cause complained of was, in fact, the proximate cause. If the evidence further shows that the injury is equally, or else with reasonable certainty, attributable to other probable causes, he must also exclude such other causes. But, in so doing, he is not compelled to meet conjecture or mere possibilities with proof to the contrary.

We are satisfied that there was sufficient evidence in this case, if believed by the jury, to establish with reasonable certainty that the fire originated in the stage, and that it was occasioned through the negligence of the driver; further, that the other possible causes suggested by appellants were not of sufficient inherent potentiality to make them competitive in the establishment of the real cause, and that they were not of sufficient certainty to prevent the issue from being submitted to the jury.

Appellants' second contention is that there was not sufficient evidence to justify an award to respondents Sommer for the destruction of their business.

The Sommers had a lease on the garage, which had two years to run. They had conducted their business profitably in the same premises for fifteen years. The owners of the building which had been burned did not replace it, and there was no other available location that the Sommers could obtain. So far as they were concerned, the business which they had established was totally destroyed, and we think that it can not be forcefully argued that the destruction of their business was any less the result of the fire, and the wrong committed, than was the loss of the building itself or of its contents. The damages were neither remote nor conjectural. *Seeley v. Peabody,* 139 Wash. 382, 247 Pac. 471. The amount allowed by the jury for this item was $2,204. This amount was within the proof offered,

and it can not be said, as a matter of law, that the verdict in this respect is not supported by the evidence.

Appellants' third contention is that the evidence does not warrant any recovery against the appellant Washington Motor Coach Company. Respondents sought to hold the latter company liable on the theory that the relationship between appellants, the indiscriminate commingling of their affairs, their method of operation, and the dominant control of the one by the other, were such as to make them identical in law. The only evidence offered by respondents on this phase of the case was the deposition of Mr. C. B. Fitzgerald, an officer of both companies, taken before the trial, and his subsequent testimony given as an adverse witness. The trial court, though entertaining serious doubt with reference to its ruling, held, as a matter of law, that the corporations were to be considered as one, and instructed the jury that, if it returned a verdict against the Yakima company, it should also return a verdict in a like amount against the Washington company.

It is conceded, even urged, by the respondents that the question was one of law for the court, and we agree that it was. The evidence upon this issue covers many typewritten pages. We can only give its essential features. The Yakima company was incorporated sometime prior to 1921 as a public carrier of passengers for hire, and, as such, later obtained a certificate of convenience and necessity to operate over a route between Yakima and Pasco and other points. Its corporate life has been maintained ever since its incorporation. The Washington company was incorporated as a similar concern in 1925, and operated between Yakima and points north and east thereof. In September, 1927, the Washington company purchased two hundred and sixty of the five hundred shares of stock

of the Yakima company, paying the owners of the stock a consideration of five thousand dollars cash and a block of stock in the Washington company. At the time of the fire, the Washington company had purchased one hundred additional shares of such stock, making three hundred and sixty in all owned by it.

At the time of the original purchase, the Yakima company was in financial difficulties. It owed about sixty-six thousand dollars to its general creditors. For the purpose of paying those debts, the Washington company loaned the Yakima company that amount, and as security for the loan took a mortgage on the assets of the borrowing company. Thereafter, the Washington company made additional loans from time to time to the Yakima company to meet deficits between its revenues and expenses. At the time of the fire, the Yakima company was paying its operating expenses and showing some profit, but it had paid nothing on the mortgage indebtedness.

The trustees of the two companies were identical in personnel. The president and general manager were the same in both companies; each, however, had its own operating manager. The Yakima company maintained its general office in Seattle in conjunction with that of the Washington company, but at the same time maintained an operating office at Yakima.

In actual operation of their stage lines, the two companies functioned separately, although they had certain working arrangements between themselves, to which reference will hereinafter be made. Separate books of account and records were kept by each company, and the revenues of each were separately deposited and disposed of. Each paid its employees through its own checks, the Yakima company making out its payrolls at Yakima, where it maintained its operating office. Frequently, as above indicated, the

Yakima company did not have sufficient gross revenues to pay its operating expenses, and to meet the deficit it would borrow money from a bank or wherever it could, but most often from the Washington company. The salaries of the president and general manager, together with the Seattle office expenses of the Yakima company, were paid with its own checks. Under a specific arrangement, these items were paid, as a whole, on the basis of ten per cent of its gross revenues. This was the basis on which the Washington company paid for the same service. Likewise, other companies which came under the "system" to which we will later refer, paid on an equivalent basis.

For the sake of convenience and business accommodation, the two companies from time to time interchanged some of their stages on a leasing basis of twenty-five cents per mile according to the mileage used. An account of these rentals was regularly kept, and the amounts owing from one to the other periodically paid. Each company, however, used its own drivers on the stages so leased. The Yakima company had a similar arrangement with the Union Pacific system, with which it had no stock connection whatever. This seems also to have been the method generally followed by the appellants in similar arrangements with other, independent companies.

The particular stage involved in this action belonged to the Washington company, but was leased to the Yakima company sometime prior to the fire. During the time that the stage was so leased, it was stored at night in the Sommers' garage under an agreement between Sommer and the Yakima company, which called for a rental of ten dollars per month to be paid by that company.

Sometime before the fire, the exact time not being disclosed by the record, the two companies, together

with several other companies in which the Washington company had a stock interest, inaugurated and adopted the use of the term "Washington Motor Coach System" to indicate a coordinated service, according to schedules and fares, between the various companies in the system. There was no corporation by that name, however, nor did the various companies in any way surrender their separate identities. The purpose of the plan or system was merely to afford through service over an extended territory. Tickets were issued in joint form, but the ticket of each company bore its own name, and each company operated its own stages over its lines in the coordinated system. In the sale of the joint tickets, the initial company acted as agent for the connecting company, and charged and received a commission of five per cent of the proceeds represented by the ticket of the connecting line. This practice was also followed by the appellant companies, operating in connection with other companies not a part of the system. The same plan seems to be in vogue on a national, as well as on a state, basis.

The foregoing facts, as we have outlined them, might be enlarged by further details, but they present substantially the picture involving the problem before us for solution, namely, whether, as a matter of law, the Washington company is to be held liable for the tort of the Yakima company.

The respondents ask us to say that the inevitable conclusion to be drawn from these facts is that the purpose of the Washington company in acquiring and exercising control over the Yakima company was that it might have full and unrestricted mastery over the physical properties of the Yakima company, and enjoy the full benefit of its certificate of convenience and necessity, to the end that the value of its own business might be enhanced, not through dividends from the

Yakima company, but through the increased and more profitable operation of its own lines. They further ask us to say that the plan and method of operation adopted by appellants, and the relationship existing and maintained between and by them, were such as must be deemed to be constructively fraudulent as to creditors and the public at large.

Whether a particular act, scheme or method of operation is actually or constructively fraudulent, depends upon the facts and circumstances surrounding the particular case. Undoubtedly, every fact that we have heretofore detailed, and the evidence affecting it, are to be carefully scrutinized, weighed and considered in order to determine whether, taken as a whole, they are consistent with honesty and fair-dealing, or whether they offend against public policy, violate the spirit of the law, or work a wrong or injustice upon others.

In this case, it may be taken as true that there was a close working arrangement between the two companies, and that each profited by such arrangement. It may also be conceded, for the sake of argument, that, if the Washington company had not purchased a controlling interest in the Yakima company, or had not advanced to it the amount secured by its mortgage, or had not thereafter, from time to time, extended financial aid to it, the latter could not have survived; further, that, if the Yakima company had gone out of existence, the immediate returns of the Washington company would have been decreased to some extent. But this does not compel the conclusion that any arrangement or agreement between the companies which might prove of mutual aid to them was necessarily fraudulent. In fact, the contrary is to be presumed until it is otherwise shown.

Under the law of this state, one corporation may

654

subscribe for and own stock in another corporation. Rem. Rev. Stat., § 3810. Two corporations may not only transact business with each other, but they may perfect such arrangements, if fairly done, as will work to their mutual advantage. The mere fact of intimacy and harmony of relationship between them, or the ownership by one of a controlling interest in the other, does not, of itself, destroy their separate identities, nor does it merge them into a single entity. They are not to be adjudged as one, in legal effect, unless their property rights and interests are so closely commingled and related as to render it apparent that they are intended to function as one, and to regard them as separate would aid the consummation of a fraud or wrong upon others. This is the declared doctrine obtaining in this state. In *First National Bank v. Walton,* 146 Wash. 367, 262 Pac. 984, we said:

"We are unable to see that 'the interests of justice require' that these two corporations should be adjudged to be, in legal effect, one, in so far as the rights of the parties to this controversy are concerned. True, they were intimately associated in a business way to the extent that the interest of one became largely the interest of the other and their managing officers were practically the same, but they were carried on as wholly separate concerns, in so far as their respective property rights were concerned. There was no commingling of their funds or property interests. They each kept wholly separate books of account. The physical possession of their respective properties was kept separate to the extent of ready ascertainment. True, the logs and lumber of the sales corporation were at the mill and yards of the lumber company, but only for the purpose of manufacture and temporary storage. There was no such physical commingling of the logs and lumber at the yards and mill of the lumber company as to, in the least, impair identification of the logs and lumber of the sales corporation.

"Nor can we see that this manner of doing business and the mutuality of interest of these corporations worked to the prejudice of the lumber company or its creditors. Indeed, this record furnishes some ground for arguing that the arrangements between these two corporations worked to the advantage of the lumber company and its creditors. It received full and fair consideration, for the logs and lumber it originally parted with, by receiving the fully paid up stock of the corporation and the $200,000 in cash from that corporation, at a time when the lumber company was solvent, at all events solvent upon so acquiring that stock and that $200,000 in money. Now, it is not enough to call for adjudicating two corporations to be in legal effect one, that it merely appear that one is the owner of practically all of the stock of the other, and that they are very intimately related in jointly carrying on their business for the purpose of mutual benefit. It must also appear that their property rights are so commingled and their affairs so intimately related in management as to render it apparent that they are, in fact and in intent, one, and, so related, to have them regarded otherwise would work a fraud upon third persons. Clearly, we think these two corporations are not so united in interest or so operated."

In *Briggs & Co. v. Harper Clay Products Co.,* 150 Wash. 235, 272 Pac. 962, we said:

"The law is, according to the great weight of authority, that there must be such a commingling of the affairs of the dominant corporation or person as to work a fraud upon the rights of third persons, before a court will be justified in piercing the veil of corporate entity and hold the two corporations, or the private person and the corporation, as one legal entity."

Respondents strongly rely upon the case of *Platt v. Bradner Co.,* 131 Wash. 573, 230 Pac. 633, wherein we said:

"It is also well settled law that, while, in general, a corporation is a separate legal entity, nevertheless when one corporation so dominates and controls an-

other as to make that other a simple instrumentality or adjunct to it, the courts will look beyond the legal fiction of distinct corporate existence, as the interests of justice require; and where stock ownership is resorted to not for the purpose of participating in the affairs of the corporation in the customary and usual manner, but for the purpose of controlling the subsidiary company so that it may be used as a mere agency or instrumentality of the owning company, the court will not permit itself to be blinded by mere corporate form, but will, in a proper case, disregard corporate entity, and treat the two corporations as one.''

Both the *First National Bank* case and the *Briggs* case, *supra,* refer to the language of the *Platt* case just quoted, but immediately thereafter use the language which we, in turn, have quoted from those decisions. The facts of the *Platt* case were such as to leave no doubt that the two companies therein involved were, in fact and in intent, one, and to regard them otherwise would have worked a fraud upon innocent persons. The same is true of the case of *Keane v. Watson Co.,* 149 Wash. 424, 271 Pac. 73, also relied on by respondents.

In *Pittsburg Reflector Co. v. Dwyer & Rhodes Co. Inc.,* 173 Wash. 552, 23 P. (2d) 1114, we said:

''In order to justify the judicial disregard of corporate identities, one, at least, of two things must clearly appear. Either the dominant corporation must control and use the other as a mere tool or instrument in carrying out its own plans and purposes so that justice requires that it be held liable for the results, or there must be such a confusion of identities and acts as to work a fraud upon third persons. In most, if not all, of the Washington decisions in which corporate entities have been disregarded, both elements have appeared, and there is strong authority for the rule that both elements (if there be two) must appear in order to warrant relief. [Citing authorities.]''

Finally, in *McCurdy v. Spokane Western Power & Traction Co., ante* p. 470, 24 P. (2d) 1075, which contains our latest expression upon the subject, we said:

"In adjudicating two corporations to be, in legal effect, one, it must appear that the one so dominates and controls the other as to make the other a mere tool or instrument of the one, so that justice requires the dominant corporation to be held liable for the results, and, further, that there shall be such a commingling of their funds and property interests, and their affairs so intimately related in management, that to consider them other than as one would work a fraud upon third persons."

There is much general authority upon the question under consideration, and an examination of the cases reveals a divided opinion. The difference in opinion, however, grows largely out of differences in states of fact. In specific cases, as the result of a peculiar category of facts, the courts have treated the two corporations as one, holding them both liable for a wrong committed upon a third party. Under a variant state of facts, the separate identities have been preserved and liability limited to the wrongdoer.

It would serve no good purpose to attempt to analyze the many cases. We refer to one only, for the reason that it presents the closest kind of analogy, in point of fact, to the case at bar. *Berkey v. Third Ave. Ry. Co.*, 244 N. Y. 84, 155 N. E. 58, 50 A. L. R. 599. The facts in that case are too long to narrate here, but the situation there involved was strikingly similar to that in the case before us; indeed, the commingling of interests and the intimacy of relationship there were even more marked and concordant than they are in this case. We take the liberty of quoting from the opinion because of its applicability to the present case and the forcefulness of its statement. It was there said:

"The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it. We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an 'alias' or a 'dummy.' All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation. Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice (Ballantine, Parent & Subsidiary Corporations, 14 Calif. Law Review, 12, 18, 19, 20). The logical consistency of a juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law. *(Chicago, etc., Ry. Co. v. Minn. Civic Assn.,* 247 U. S. 490 [38 S. Ct. 553, 62 L. Ed. 1229]; *United States v. Reading Company,* 253 U. S. 26, 61, 63 [40 S. Ct. 425, 64 L. Ed. 760]). At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form. We find in the case at hand neither agency on the one hand, nor on the other abuse to be corrected by the implication of a merger. On the contrary, merger might beget more abuses than it stifled. Statutes carefully framed for the protection, not merely of creditors, but of all who travel upon railroads, forbid the confusion of liabilities by extending operation over one route to operation on another. In such circumstances, we thwart the public policy of the State instead of defending or upholding it, when we ignore the separation between subsidiary and parent, and treat the two as one."

So, here, we are convinced that the facts with which we are now immediately concerned, and about which there is no dispute, do not establish a dominion so complete or an interference so obtrusive as to compel liability under the rule of agency; and further, that, whatever control the Washington company may have had over the Yakima company by virtue of its stock ownership, it was not such as to constitute the latter a mere "instrumentality," "conduit" or "alter ego" of the other; and finally, that neither public policy nor the right of any party here concerned requires the sacrifice of the juridical conception of distinct corporate existence.

Appellants' final contention is that whether the two companies were identical or separate was a question of fact to be submitted to the jury under proper instructions. In view of what we have already said, it is unnecessary to further discuss that assignment of error.

The judgment will be affirmed as to the appellant Yakima Motor Coach Company, and reversed as to the appellant Washington Motor Coach Company, with direction to dismiss as to the latter company.

MAIN, MITCHELL, TOLMAN, HOLCOMB, MILLARD, and GERAGHTY, JJ., concur.

BLAKE, J. (dissenting)—The genius of the common law has always been its capacity to expand and encompass new conditions. Arising, as it does, from the customs of the people, it must, to serve any useful purpose, reflect the necessary legal consequences of such customs. In his work, Law, Its Origin, Growth and Function, Mr. James C. Carter says (p. 71):

"It has often been said by the most approved writers that custom is *one* of the sources of law, and indeed Blackstone views the body of our unwritten

law as being custom, or founded upon custom; but the sort of custom thus intended is *ancient* custom, reaching so far back that its beginning is not known. Such a limitation of custom in the making of law seems to me to be without foundation, and the object in giving the last illustration is to show that *present* custom, provided it is established, is as efficient as if it were centuries old.''

Naturally, when confronted with new problems, when exploring new fields in the relationships of men, the courts seek analogies in older and more thoroughly explored fields. When such analogies are found, however, there seems to be a distinct tendency to pigeon-hole the new relationship and make it conform to the rules applied to the old. When this happens, the law applicable to the new relationship is not allowed a development free enough to cope with consequences which may be the necessary outgrowth of the new conditions.

In dealing with the relationship of dominant and servient corporations, the courts have sought and found analogies in the rules of law appertaining to fraud and agency, through the application of which they have held the dominant corporation responsible for the acts of the servient. This is well enough, but it will not do to confine such responsibility of the dominant corporation to cases only where the conventional rules of fraud may be applied, or where the conventional relationship of agency exists.

It seems to me that the dominant corporation's responsibility for the acts of its subsidiary are to be measured by the use it makes of the latter. If the dominant corporation is merely a stockholder of the subsidiary and does not look to it for anything beyond dividends, then the corporations are entitled to be regarded and treated as distinct entities. But where the dominant corporation completely controls the

destiny of the servient, when it uses the subsidiary merely as a convenience—as an instrumentality or incident to a larger purpose—without concern or interest in the latter's capacity to earn dividends, it should not be allowed to escape responsibility for its puppet's acts on the theory of separate entity. *Platt v. Bradner Co.*, 131 Wash. 573, 230 Pac. 633.

Here, the Washington company is not merely a stockholder of the Yakima. The latter is under complete domination by the Washington company and in utter financial bondage to it. That the Washington company has no concern with the dividend-paying capacity of the Yakima, is apparent. The former takes ten per cent of the latter's gross earnings for managerial and accountancy services. It rents busses to the Yakima at the rate of twenty-five cents a mile— a rate sufficient to amortize the cost of a bus within a year. Obviously it (the Washington company) so manages the affairs of the Yakima that substantially all of the latter's earnings are absorbed in operating expenses. After payments of interest, service charges and bus rental to its parent, nothing can be left of the Yakima's earnings to be allocated to dividends. It is financially irresponsible—it is judgment proof— all because of the method by which its business is conducted by the Washington company. The latter should not be allowed to escape responsibility for the Yakima's acts through the thin disguise of separate corporate entities.

In my opinion, the facts bring the case clearly within the rule of *Platt v. Bradner, supra.*

BEALS, C. J. (dissenting)—I also dissent from the reversal as to Washington Motor Coach Co., and concur in much of what Judge Blake has written.