[No. 19758. Department Two. June 25, 1926.]

## C. M. Seeley, *Respondent*, v. Charles E. Peabody, *Appellant*.[1]

[1] Sales (172)—Conditional Sales—Contract Creating Conditions—Construction. Where a conditional sales vendor of personal property was in possession of a balance of over $320, raised by operations, which by the terms of the conditional sale was to be applied on installments due, the vendee's right to have the same credited upon an overdue installment of $300 is not dependent upon a special finding of a jury upon an issue as to whether the parties in subsequent negotiations had agreed that such application should be made.

[2] Appeal (389)—Review—Amendments to Conform to Proof. A complaint against a conditional sales vendor for converting the property, in treating the contract forfeited for default in payments at a time when nothing was due, will, on appeal, be deemed amended to conform to proof and subsequent findings of the jury that strict compliance with the time for payment of the installments in question had been waived.

[3] Trover and Conversion (13)—Defenses—Restoration or Offer to Restore Property. Recovery for the conversion of stock is not defeated by the fact that, after the conversion, the defendant turned the property back to the plaintiff by offering to allow plaintiff to come and take his property which the defendant had been using.

[4] Damages (118)—Breach of Contract—Loss of Profits—Evidence—Sufficiency. In case of the destruction of an established business by wrongful acts, the damages for loss of prospective profits should not be measured with any degree of nicety, where the circumstances do not permit of such measurement and could not be fixed with certainty.

[5] Same (26)—Reduction of Loss—Duty of Person Injured. One whose established business had been damaged by the wrongful acts of another need not submit to an entirely new contract forced upon him in order to mitigate his damages.

Mackintosh, J., dissents.

Appeal from a judgment of the superior court for King county, Truax, J., entered September 14, 1925,

[1] Reported in 247 Pac. 471.

upon the verdict of a jury rendered in favor of the plaintiff in an action in tort.    Affirmed.

*Bronson, Robinson & Jones,* for appellant.

*Karr & Gregory, H. G. Sutton, George F. Hannan,* and *Ryan & Desmond,* for respondent.

PARKER, J.—The plaintiff Seeley seeks recovery of damages, alleged to have resulted to him from the unlawful conversion by the defendant Peabody of certain dairy livestock, feed and equipment, being all of the personal property of a dairy plant operated by Seeley. The larger portion of the property was held by Seeley under a conditional sale contract executed by Peabody. The balance of the property belonged to Seeley, free from all rightful claim of Peabody under the conditional sale contract or otherwise. Seeley seeks to have his damages measured: (1) by the value of the conditional sale contract property, less any balance due Peabody on the purchase price thereof; (2) by the value of the balance of the property; and (3) by the loss suffered by him in the destruction of the dairy business, resulting from the defendant's taking and converting all of the physical personal property used in its operation. A trial upon the merits, in the superior court for King county sitting with a jury, resulted in special findings and general verdict awarding recovery to the plaintiff, in substance as follows:

For conversion of the property not covered
  by the conditional sale contract, the value
  thereof ............................... $3,069 59

For conversion of the property covered by
  the conditional sale contract, the value
  thereof, less the balance due upon the pur-
  chase price .......................... 3,166 50

For the destruction of the business, resulting
from the conversion of the physical prop-
erty ................................ 7,500 00

Total award by general verdict.....$13,736 09

Final judgment was rendered by the court accordingly,
from which Peabody has appealed to this court.

On March 29, 1923, Peabody was the owner of an
established dairy business in King county and all of
the personal property used in the conduct of that busi-
ness. On that day, he entered into a conditional sale
contract for the transfer of title to all of the personal
property of the dairy to G. W. Gregory. While the
contract did not, in express terms, provide for the
transfer to Gregory of the business and good will there-
of, such was plainly the intent of the parties. The
agreed purchase price was $10,058, payable $400 on
the first day of May, 1923, and on the first day of each
succeeding month, until the whole of the purchase price
should be so paid, when title to the property should
fully vest in Gregory. Possession of the property was
to be, and was then, taken over by Gregory, with a view
of his continuing the operation of the dairy. It was
agreed:

"That all proceeds arising from the operation of
the dairy shall be received by the vendor and shall
be disbursed by him as follows:

"(a) To the payment of labor used in operating
said dairy.

"(b) In payment of feed and necessary incidental
expenses connected with operating said dairy.

"(c) In payment of the purchase price provided
for herein.

"(d) The remainder to be paid to the purchaser."

It was also agreed that, in case default be made in
making payment of any instalment of the purchase

price, as provided in the contract, Peabody should have the right to take possession of the property, and declare all rights of Gregory thereunder and all sums theretofore paid on the purchase price to be forfeited.

Shortly after the making of the contract and the commencement of the operation of the dairy by Gregory, he transferred his interest in the contract and the dairy to the respondent Seeley. This was consented to by Peabody, and thereafter the conditional sale contract was treated by Peabody and Seeley as being between them.

About April 23, 1923, by agreement of the parties, certain of the unproductive stock was sold, for which there was received $1,504. This went into the hands of Peabody, as did other monies received from the operation of the dairy, the parties evidently regarding that as being in compliance with the above quoted terms of the contract.

On June 1, 1923, Peabody and Seeley had come to an agreement that the finances of the dairy should be transferred to Seeley; that is, instead of the proceeds being received and paid out by Peabody, the proceeds should be received and paid out by Seeley. On that day, it was agreed between Peabody and Seeley that the future maturing monthly instalments upon the conditional sale contract should each be reduced from $400 to $300. Peabody then had in his possession the $1,504, the proceeds of the sale of unproductive stock. It was agreed that this money should be available to Seeley for the purchase of new productive stock, Peabody agreeing that Seeley should have the privilege of drawing upon him for that purpose, up to that amount, at any time prior to December 31, 1923. Seeley did accordingly draw upon Peabody and expended of this fund all but $320 thereof, which remained in Pea-

13—139 WASH.

body's hands on December 31, 1923. The $300 instalments upon the conditional sale contract, falling, due on the first of each month up to and including December, 1923, were all paid by Seeley to Peabody soon after the first of each month. On December 31, 1923, Seeley rendered to Peabody an account of their dealings up to that time, claiming the $320 balance in Peabody's hands as a credit upon the conditional sale purchase price, thus in effect, claiming that the instalment upon the purchase price due January 1, 1924, was thereby overpaid; Seeley manifestly proceeding upon the theory that, since the balance of $1,504, towit, the $320 in Peabody's hands, was no longer applicable to the purchase of additional stock, he, Seeley, then had a right to have the $320 applied upon the purchase price instalments of the conditional sale contract under the provisions of the above quoted language of that contract; and also because, as he testified, Peabody had expressly so agreed at the time the $1,504 was left in Peabody's hands on June 1, 1923. Indeed, on January 4, 1924, Peabody notified Seeley as follows: "I want no more cows bought on current account," manifestly meaning that the balance of the $1,504 fund in his hands would no longer be available for that purpose.

On January 25, 1924, Peabody, in the absence of Seeley, took possession of the personal property covered by the conditional sale contract, claiming forfeiture of all of Seeley's interest therein. This was done, manifestly, upon the theory that all rights of Seeley, and also Gregory, in the property were then subject to forfeiture, because of default in the full payment of the January 1, 1924, instalment of the purchase price. At the same time, Peabody took possession of a large amount of other personal property, which was being used by Seeley in the operation of the

dairy, in which property Seeley had absolute title, wholly unincumbered by any lawful claim of Peabody. At the time Peabody so took possession of the property on January 25th, it seems, according to his own claim, there was unpaid on the January 1, 1924, instalment of the purchase price, an amount not exceeding approximately one hundred dollars. This seems to have been the only claimed legal basis of Peabody's then claimed right of forfeiture.

We think the evidence also warrants the conclusion that, during a period of a week or two immediately prior to Peabody taking possession of the property, with a view of forfeiture, negotiations had been going on between him and Seeley looking to new arrangements between them with reference to their respective rights in the property. Peabody took possession of the property without any prior notice whatever to Seeley or to Gregory of his intention to claim forfeiture under the terms of the conditional sale contract, and without any demand whatever upon Seeley or Gregory to make full payment of the January 1, 1924, instalment of the purchase price. This action was commenced in March, 1924.

It is contended in behalf of Peabody, that there was such default in payment of the January 1, 1924, instalment of the conditional sale contract as to entitle him to declare a forfeiture of all of Seeley's rights under that contract and repossess himself of the property, and that the trial court should have rendered its judgment accordingly upon the jury's findings. One of the questions of fact in the case was as to whether or not Peabody, at the time he agreed that Seeley might draw against him to the extent of the $1,504 in his hands, the proceeds of the sale of the unproductive stock, also then agreed that whatever balance of that

fund was in his hands on December 31, 1924, should be credited to Seeley on the conditional sale contract. The testimony of Peabody and Seeley was in direct conflict on this question of Peabody's then expressly so agreeing. The jury, by a special finding, disposed of this question as follows:

"INTERROGATORY No. 1.

"Was there an agreement between Mr. Seeley and Mr. Peabody to the effect that any balance of the $1,-504.50 proceeds of the auction sale, remaining unexpended for more live stock after December 31, 1923, should be applied on account of payments owing by plaintiff to defendant on the conditional sales contract?

"ANSWER:  No."

[1]  Counsel for Peabody seem to assume that this finding became conclusive of Seeley's right to have the balance in Peabody's hands credited on the conditional sale contract. It is difficult for us to understand, how this special finding can be considered final as to Seeley's right to have the balance so credited, since that balance in Peabody's hands was the proceeds of the sale of property Seeley was, by the terms of the conditional sale contract, required to pay for. Just how Peabody was to have the right to retain that balance and, at the same time, have full payment of all of the instalments for all of the property, including the property the sale of which produced that $1,504, we cannot understand. The very terms of the original conditional sale contract, above quoted, put the proceeds "arising from the operation of the dairy" in Peabody's hands for the purpose, among others, of "payment of the purchase price provided for herein." That balance is manifestly the unexpended proceeds of the agreed manner of operating the dairy; that is, of selling unproductive stock with a view of purchasing productive stock,

as was agreed upon. It would seem that the jury's general verdict in favor of Seeley is supported by this theory, even though the special finding was against Seeley upon the question of Peabody's agreeing specifically, apart from the provisions of the original conditional sale contract, to allow such balance to be credited upon the conditional sale purchase price.

[2] Let us assume, however, that this special finding of the jury means, that there never was at any time, even by the terms of the original conditional sale contract, any agreement that Seeley or Gregory was to have credit on the conditional sale purchase price for any unexpended balance of this $1,504 so coming into Peabody's hands, and that therefore there was a technical default in the full payment of the instalment falling due January 1, 1924.

The jury also made this special finding:

"INTERROGATORY No. 2.

"Did defendant Peabody by word or conduct waive strict compliance with that clause of the contract requiring plaintiff to pay $300.00 by January 1, 1924?

"ANSWER: Yes."

We do not understand counsel for Peabody to seriously contend that this finding is not supported by the evidence. Indeed, we think it is well supported by the evidence. It is argued, however, that this was not an issue in the case under the pleadings. It is true that Seeley, in his amended complaint, alleges in substance that, at the time Peabody took possession of the property on January 25, 1924, nothing was due upon the purchase price of the conditional sale contract, and does not in terms allege waiver of strict performance as to full payment of the January 1, 1924, instalment. The record, we think, renders it quite plain that the case was tried upon the theory that Seeley claimed there was nothing due at the time.

Peabody took possession of the property on January 26, 1924, and also upon the theory that, in any event, strict compliance as to the time of payment of the January 1st, 1924, instalment upon the purchase price had been waived by Peabody, so that he could not, in any event, rightfully claim forfeiture of Seeley's rights under the conditional sale contract without first notifying him of his, Peabody's, intention to claim forfeiture and give Seeley a reasonable time to make payment of the January 1st, 1924, instalment, in so far as it remained unpaid. It seems plain to us that the complaint must now be deemed amended, in so far as it may be necessary to fit the proofs supporting these two theories of recovery. To our minds, they are not inconsistent, proof of one not being necessarily contradictory of proof of the other. We think that this special finding of the jury establishes the fact that Seeley was not in default, in the sense that Peabody was entitled to then effectually claim and declare Seeley's rights under the conditional sale contract forfeited, without giving Seeley notice and opportunity to make payment of whatever sum may have been past due upon that instalment.

[3] Contention is made in behalf of Peabody that the evidence does not support the verdict and judgment, in so far as there is awarded recovery by Seeley for Peabody's conversion of the property not covered by the conditional sale contract; that is, property belonging to Seeley, to which Peabody had no rightful claim whatever. This seems to be rested upon the theory that Peabody tendered to Seeley all such property soon after taking possession of the whole of the property used by Seeley in the operation of the dairy. This tender consisted, at most, merely of an offer to let Seeley come and take his property away. His

property was a part of the dairy stock and equipment, and of particular value to him as a part of the dairy and the business as a whole. We think he was not bound to accept such tender of the portion of the property not covered by the conditional sale contract. Peabody took all of this property, and, prior to his tendering it back to Seeley, converted and used it in the dairy business, and has at all times since then possessed it and had the benefit of it. There is no question here made as to its value, which is that awarded by the jury as damages for its taking by Peabody.

[4] It is contended that the evidence does not support the verdict and judgment, in so far as there is awarded to Seeley damages for the destruction of the established dairy business. The evidence, we think, fairly shows that the business was, at the time Seeley took charge of it under the conditional sale contract, a well-established business of several years standing, though at that particular time, and possibly for some time previous, it seems not to have been a profitable business. There is room for believing that this was the result of the run-down condition of its physical property at that time. However, during the eight following months of management of the business by Seeley, the evidence tends to show that he materially improved it by materially improving its physical property and equipment, not only by improved care of the original stock and equipment coming to him under the conditional sale contract, but also by putting into the business additional stock and equipment of high quality, of some several thousand dollars in value. In other words, he had built up a good, high-class dairy plant in King county within convenient marketing distance of the city of Seattle.

True, the prospective profits of the business were

not proven with any very great degree of certainty. Indeed, it may be said that the profits of the business during the eight months in which it was operated by Seeley were not proven within a great degree of certainty; but that there were some substantial profits proven as having accrued during that period, and that the plant had been physically much improved, seems to us certain. This problem, it must be remembered, as to profits presents a question of past and prospective profits of an established business, and not prospective profits upon some particular contract, which looks to the working out of some business problem to a final end in the comparatively near future after the making of the contract; such, for instance, as the purchase of a specified quantity of goods with a view of selling the same in the near future. In such cases, the prospective profits, we apprehend, must be proven with a greater degree of certainty and exactness than in the case of the destruction of an established business.

We think it may be said, speaking generally, that, when one injures another by some unwarranted act, the measure of the damage of the one so injured will not be measured by the courts with any great degree of nicety, when the circumstances are such as to not permit of such measurement. Our decisions in *Bogart v. Pitchless Lumber Co.*, 72 Wash. 417, 130 Pac. 490; *Seidell v. Taylor*, 86 Wash. 645, 151 Pac. 41, and *Loutzenhiser v. Peck*, 89 Wash. 435, 154 Pac. 814, contain observations in harmony with this general view touching the proof and measurement of such damages. We cannot say, as a matter of law, that the verdict of the jury, awarding Seeley $7,500 damages for the destruction of the dairy business, is not supported by the evidence introduced upon the trial of this case.

[5] Contention is made, particularly in connection with the question of damages for destruction of the

business, that Seeley was not entitled to recover such damages, because of his refusal to accept an offer of Peabody to return the property to him upon his paying the entire conditional sale contract purchase price at once, less six per cent discount on the deferred contract instalments, computed up to the time each became due under the terms of that contract; this discount concession being made in view of the instalments not drawing interest before maturity. We do not think that Seeley was under any obligation to put himself out to that extent in order to minimize or do away with the damages suffered by him. It was not a question of Seeley paying out a small sum, or slightly inconveniencing himself with a view of minimizing his damages. It was a question of submitting himself to an entirely new contract, sought to be forced upon him by Peabody, to the end that Peabody might avoid the damaging results of his own unwarranted act. *Murphy v. Fidelity Abstract & Title Co.*, 114 Wash. 77, 194 Pac. 591; 8 R. C. L. 442-445.

Some further contentions are made, touching alleged errors committed by the trial court in the admission of evidence and the giving and refusing to give instructions. These we have examined and deem it sufficient to say that we regard them as without substantial merit. A painstaking examination of this very voluminous and much involved record convinces us that Peabody has had a fair trial and that the awards made by the verdicts and judgment must be in all things affirmed.

The judgment is therefore affirmed.

TOLMAN, C. J., MAIN, and MITCHELL, JJ., concur.

MACKINTOSH, J. (dissenting)—I cannot agree that the evidence justified the verdict of damages for the destruction of the business.