## HEIN v. MARCANTE ET AL.

(No. 2166; June 11, 1941; 113 Pac. (2d) 940)

84

For the appellant, there was a brief and oral argument by *Clarence W. Cook* and *Louis Kabell, Jr.* of Evanston.

86

For the respondents, Minnie Molinar Marcante and
J. A. Christmas, Executors of the Estate of Angelo

Molinar, Deceased, there was a brief and oral argument by *W. A. Muir* of Rock Springs.

For the respondent, Ernest Molinar, there was a brief by *J. R. Armstrong* of Rawlins.

BLUME, Justice.

This case—an action in replevin brought by plaintiff Henry Hein, doing business under the name of Table Supply at Kemmerer, Wyoming—was here before. In the first trial, the plaintiff recovered a judgment for $6000. The case was reversed in this court. Marcante et al. v. Hein, 51 Wyo. 389, 67 P. (2d) 196. The case was re-tried in July, 1939. The original defendants were Angelo Molinar and Ernest Molinar. The former died, and his executors were substituted as defendants in his place.

The plaintiff in his petition alleged that he was the owner of, and entitled to the immediate possession of a stock of goods kept by him in a store at Kemmerer, Wyoming, and the furniture and fixtures in connection therewith. He alleged in paragraph 3 as follows:

"That on the 28th day of January, A. D. 1933, at said 805 Pine Avenue, in the said Town of Kemmerer, Lincoln County, State of Wyoming, the Defendants forcibly, maliciously, wrongfully, unlawfully and oppressively, and with reckless indifference and wanton disregard of the rights of Plaintiff, took said goods and chattels from the possession of this Plaintiff and ever since has and still unjustly and wrongfully retains the same, to the damage of Plaintiff in the sum of $9,000.00;"

He alleged in paragraph 4:

"That ever since the said wrongful, unlawful and forcible taking of said goods and chattels by Defendants from the possession of Plaintiff, the Plaintiff has been by Defendants excluded from his said business and will be by him excluded therefrom, and will be

thereby for at least thirty days, prevented from tending to his usual vocation of managing, controlling and conducting his said business of the Table Supply, at which he was earning an income of at least $3,600.00 per year, to his damage in the further sum of $300.00."

He alleged in paragraph 6:

"That in said wrongful, forcible and unlawful taking of said goods and chattels from the possession of Plaintiff, Defendants deprived him of the keys to said building and took entire charge of Plaintiff's said business, closing the same absolutely to the public, thereby injuring the reputation of said business and the standing thereof throughout the community and Lincoln County, Wyoming, which said business embraces to Plaintiff's damage in the further sum of $3000.00."

He also claimed damages by reason of some necessary repairs which he would be compelled to make, and exemplary damages for outrage and oppression committed by Ernest Molinar in taking possession of the property, and because of his collusion with one Bill Martin. Plaintiff prayed for recovery of the property, or $7,625, the value thereof, and $7,875 damages.

After the writ of replevin was issued, the sheriff took possession of all the property sued for. But no bond was furnished by the plaintiff, and hence the sheriff, after about a week, redelivered the property to the original defendants, and the case proceeded as one for damages under Section 89-4014, Rev. St. 1931. Ernest Molinar was in possession of the property, and previously and subsequently acted as agent for Angelo Molinar, who conducted a wholesale grocery department at Kemmerer. On September 23, 1932, the plaintiff gave to Angelo Molinar a note for $1174.40, due in six months, for groceries bought, and to secure it gave a chattel mortgage on the stock of goods above mentioned, of the approximate value of $2000. The mortgage provided that if the mortgagee "shall deem

the security hereby granted unsafe or insufficient, then it shall be lawful for said (mortgagee) his heirs, executors or assigns, to declare the principal sum hereby secured, with interest thereupon, or any part of such principal or interest then unpaid, at once due and payable * * * and to enter in and upon any place and take immediate and full possession of the whole of said property, goods and chattels to his or their own use, and sell the same according to law for the best price that can be obtained," etc. The answer to the petition of plaintiff denied taking unlawful possession of the property in controversy, but alleged that it was voluntarily turned over to them by the plaintiff. They also set up the mortgage above mentioned, alleged that the mortgagee justifiably and upon good grounds felt himself insecure, and after obtaining possession of the stock of goods sold it for $981.77, leaving due a balance on the indebtedness in the sum of $291.53, for which judgment is prayed in favor of the mortgagee. Plaintiff filed a reply, admitting the execution of the note and mortgage above mentioned, but denying in substance—in so far as it is material to be mentioned— that the mortgagee had any just and good grounds for feeling himself insecure under the insecurity clause contained in the mortgage. A jury empaneled in the case returned verdicts in favor of Ernest Molinar and the executors. Plaintiff made a motion for judgment notwithstanding the verdict. The motion was overruled, judgment was entered for defendants, and plaintiff has appealed. The parties will be referred to herein as nearly as possible as they were in the court below. When the name Molinar is herein used alone it refers to Ernest Molinar. The term mortgagee will be used to designate Angelo Molinar or his executors.

■ Counsel for plaintiff argue that the verdict in this case is not sustained by any substantial evidence. They claim in fact that not a scintilla of evidence sus-

tains it. It is difficult to see how they have come to such conclusion. The trial court differed with them, and we are constrained to do likewise. It would not subserve any good purpose to review the testimony in detail. We shall only give an outline.

It is claimed that the mortgagee was not justified in taking possession of the stock of goods under the insecurity clause in the mortgage. While there is some diversity of holding in the authorities, many of them hold that the mortgagee must act reasonably, and in good faith on probable cause to apprehend loss of the security. 14 C. J. S. 783. The case was tried in the lower court on that theory. So we shall discuss the evidence in that light.

It appears that Angelo Molinar conducted a wholesale grocery establishment at Kemmerer. Ernest Molinar was the manager. The plaintiff, prior and subsequent to September 23, 1932, bought goods from that establishment. As already stated, the mortgage given herein was given for goods bought previously. The testimony on behalf of the defendants indicates that after the mortgage was given, plaintiff dealt with, and was supposed to deal with the mortgagee only on a cash basis; that frequently, however, the plaintiff would fail to pay the cash, but would become delinquent, and that an agent of the mortgagee would sometimes be compelled to go after the money as often as ten times before it would be collected; that plaintiff had little or no credit during this time at other places, but would have his goods bought outside of Kemmerer come to him C. O. D.; that plaintiff's credit rating with R. G. Dunn & Co. was poor; that plaintiff extended too much credit to his customers; that attorneys for creditors of plaintiff had bills against the latter in their hands, to the knowledge of Ernest Molinar; some of them in large amounts; that salesmen told the latter that plaintiff owed plenty of bills; that a number of

farmers told him that plaintiff owed them money; that plaintiff owed a large amount of money for rent, lights, etc.; that plaintiff was sued a number of times after September 23, 1932, for money owing; that a few days prior to January 28, 1933, plaintiff, after being sued, told Ernest Molinar that he was discouraged, and almost was inclined to turn the store over to the latter. Plaintiff admitted that, but claimed that it was said in a joke. Ernest Molinar testified that that was not true. It further appears by the testimony of the latter and by that of the witness Jiacolletti, truck driver for defendants, that the stock of goods in plaintiff's store was rapidly decreasing after January 1, 1933. Mrs. Hein testified for the plaintiff that she and her husband always had special sales on Saturdays, and that they would sell goods during these days of the value of $400 to $1000. January 28, 1933, when Ernest Molinar went to plaintiff's store, was a Saturday. He testified, in effect, that if plaintiff had been permitted to sell goods during that day, the remainder of the stock of goods would have been insufficient to pay the debt due under the mortgage, and that he felt himself insecure. Plaintiff testified, and he was corroborated by Mrs. Hein, that he offered to let Ernest Molinar sit in the store and take the cash for the sales made on that day. Counsel in their brief state that this testimony is undisputed. We are not certain that it is important, but the record shows that Ernest Molinar denied it, testifying that if he, plaintiff, would replenish the stock of goods in the store to the extent of $300 to $400, he would not disturb plaintiff in any way, and that he was anxious that plaintiff's store should not be closed. Plaintiff further testified that he offered Molinar a note made by one Akutagawa in the sum of about $1100, but that Molinar refused the note. The latter testified that the maker of the note, according to the maker's own statements to him, was not solvent; that

he, Molinar, had had the note in his possession during the previous year, and had succeeded in collecting but little money thereon. The testimony indicates that the stock of goods on January 1, 1933, was worth from $1600 to $1900. Molinar testified that he considered it worth on January 28, 1933, about $900 to $1000. The perishable goods were sold for $281, and the remainder of the stock was sold at sheriff's sale at $700, a total of $981. The appraisers who appraised the property under the replevin action fixed the value of the stock at $1177. That was, however, after the perishable goods had been sold, and adding the value thereof at $281, would make a total of $1458.00. There was due on the note at that time the sum of $1034. Taxes in the sum of $79.00 remained unpaid. Adding these would be the sum of $1113. If, then, the plaintiff had sold goods from the store on Saturday, January 28, 1933, of the value of the minimum sum testified to by Mrs. Hein, and if we take the value as fixed by the appraisers plus $281, above mentioned, the remainder would have been less than the amount due on the note plus taxes due, and if we take the value as the amount for which the property was sold, the remainder would have been worth only $581, as against $1113 due on the note plus taxes. It is true that plaintiff testified that the perishable goods were worth $600, but the conflict as to values was to be resolved by the jury. We are unable to say that under the foregoing and other corroborative testimony, the jury were not warranted in finding that the mortgagee was justified in taking possession of the stock of goods pursuant to the insecurity clause contained in the mortgage, under the rule of law above mentioned. Plaintiff testified that he had reduced his indebtedness the previous year by $5000. We are not certain as to what bearing that has in the case. However, plaintiff's statement was gen-

eral. He gave no details, and the jury were not compelled to credit this testimony.

■ The chattel mortgage above mentioned covered only the plaintiff's stock of goods, and nothing else. It gave no right to close plaintiff's store, and no right to the furniture and fixtures therein. These fixtures had been mortgaged to the bank in Kemmerer for about $1400. If the mortgagee had merely taken possession of the stock of goods, and hauled it away, the case would probably have been simple. But he left it in the store and he had possession of the latter until the goods were finally sold, which was after March 23, 1933, and the keys to the store were then delivered to the bank. The brief of counsel for plaintiff is full of contentions in that connection. The defendants claim that the store was turned over to them voluntarily, and that they never exercised or claimed any dominion over the furniture and fixtures. Plaintiff denies that. We shall pass over the rule called to our attention by counsel for defendants that the store as real property cannot be an object in litigation in an action in replevin (54 C. J. 421)—we shall overlook that Maitland stated that the old forms of action still rule us from the grave—and for the purpose of this case consider it on the same footing with the furniture and fixtures, for the character of possession of the store sheds light on the character of possession of the furniture and fixtures. A good deal of evidence was introduced on the subject.

. Ernest Molinar went to plaintiff's store early on the Saturday morning above mentioned, in company with the sheriff, who, however, soon left. Molinar testified that he took him along merely for the purpose of avoiding a personal conflict with the plaintiff, and the evidence shows that nothing was done or said by the sheriff. What took place in the store is in conflict. Plaintiff testified that Ernest Molinar demanded the

keys to the store; that he asked to be permitted to go out and see whether or not he could raise the money due the mortgagee; that he went out three different times, but failed to procure the money; that at one of the times he brought Akutagawa along, whose note, as already noted, he offered to Molinar, but it was refused; that Ernest Molinar closed the doors, pulled the shades, and took the keys out of his hand. He admitted, however, that he told his wife and Eldon Peart, the butcher in the place, to give Molinar their keys, and that he placed a sign on the window that the store was closed by Molinar. He also admitted that he agreed that the perishable goods should be sold, and that he was in the store on Sunday without demanding the keys back, and that he made no subsequent demand for the keys. Mrs. Hein and Peart testified that Ernest Molinar demanded the keys, closed the doors, pulled the shades, and made a lot of "racket" without stating what that racket was. It appears that Jiacolletti was the truck driver for the defendants, and he came to the store some time during the early part of the fore-noon, for the purpose, as shown by the testimony for the defendants, to haul the stock of goods in the store to the warehouse of defendants. Counsel for plaintiff claim that he came for the purpose of intimidating the plaintiff. We find nothing in the evidence to justify that. Jiacolletti testified that Molinar made no racket, and demanded no keys; that plaintiff himself pulled down the shades on the windows of the store; that Mrs. Hein cursed Molinar; that Hein put up the sign that the store was closed by Molinar; that he heard a good deal of the talk between Molinar and plaintiff; that the former demanded no furniture or fixtures, and simply wanted the plaintiff to replenish the store with goods of the value of about $300 to $400; that plaintiff went out to see if he could raise the money due on the mortgage; that when he came back the last

time he threw his keys to Molinar, stating in substance that he had done no good, and "here's the God-damned keys—lock the son of a bitching place up," or something to that effect. That was between 12 and 1 o'clock. The testimony of Molinar on the point is similar. He stated that he did not close the door or pull the shades; that he changed the lock on the doors the next day or on Monday; that he never assumed control of the furniture and fixtures; that he asked the owner of the building whether he might keep the stock of goods in the building until he could dispose of it; that permission was granted; that after the goods were disposed of, he turned the keys over to the bank which had a mortgage on the furniture and fixtures. Counsel for plaintiff argue that Ernest Molinar, as well as the witness Jiacolletti, were not entitled to be believed by the jury, and that their testimony is wholly unreliable. That claim was proper to be made before the jury, but is hardly proper here. So far as we can see, the testimony of these witnesses is straight-forward and consistent. The jury had the right to conclude therefrom that plaintiff turned over the keys to the store voluntarily. In fact, it is difficut to see how they, under all of the evidence, would have been justified in arriving at any other conclusion. If Molinar closed the door and pulled the shades, that was evidently done for the purpose of protecting the rights of the mortgagee in the stock of goods, for the customers, against whom the doors were closed, were buying part thereof. At least these acts were consistent with the protection of these goods and the lien thereon. The only other testimony produced by plaintiff to show that Molinar assumed dominion over the store and the furniture and fixtures was to the effect that he demanded the keys. That demand was verbal. It is stated in Gillette v. Roberts, 57 N. Y. 28, 33, that "where words are relied upon (to establish conversion) they must be uttered

under such circumstances in proximity of the property as to show a defiance of the owner's right, a determination to exercise dominion and control of the property and to exclude the owner from the exercise of his rights." A distinction must be drawn between a situation in which the person using mere words is in possession of property and one in which he is not. In the latter case, it seems, mere words are not sufficient to constitute conversion. In Gruber v. Savings and Loan Co., (Cal. App.) 80 P. (2d) 153, the court stated that "mere words, unaccompanied by any act, cannot constitute a conversion of personal property." In Guarantee Bond and Mortgage Co. v. Hilding, 246 Mich. 334, 224 N. W. 643, the court stated that "from an examination of the cases, we are satisfied that the better rule is that while a manual possession of the property is not necessary to constitute a conversion, something more than mere words is necessary. The words used may be evidence of conversion, but are not evidence per se." In First Nat. Bank v. Howard, 21 Ala. App. 363, 108 So. 402, the court stated that "mere words or declarations, while they may be admissible as evidence, will not in themselves alone amount to conversion. It is necessary to show more." As particularly applicable to the furniture and fixtures herein, we may refer to Edinburg v. Allen Squire Ci, 299 Mass. 206, 12 N. E. (2d) 718, 721, where the court stated that "merely locking the doors * * * and retaining possession of the keys without further exercise or claim of dominion over the plaintiff's property would not constitute conversion." It may be, that in view of the fact that Molinar demanded the stock of goods, or the equivalent thereof, under the authority of the mortgage in question, it could be held that these goods were not delivered voluntarily. But it is difficult to see how that could be said in connection with the store, the furniture and fixtures. The mortgage did not cover

them. The plaintiff knew that. No force was used to get the keys. We find no threats, or at least none which in any way would indicate that there was any danger to the plaintiff if he did not deliver the keys. The simple truth seems to be that plaintiff felt and thought that if he could not retain the stock of goods, the store might as well be closed and abandoned. And this explains the fact that he himself put up the sign that the store was closed by Molinar.

Counsel argue that Molinar changed the keys. That, of course, was the natural and sensible thing to do, since he wanted to insure the safety of the stock of goods, and it is in no way inconsistent with the voluntary surrender of the store. A great deal is made of the fact that plaintiff on the Monday following consulted counsel and commenced the action in replevin. There is no doubt that plaintiff did not want to close his store. Ernest Molinar underwent considerable tongue-lashing on the part of plaintiff and Mrs. Hein. Plaintiff was disappointed, and it can hardly be considered surprising that he consulted counsel. But it does not follow that he did not voluntarily deliver up the store on the previous Saturday. Counsel fail to distinguish between the stock of goods on the one hand, and the store, furniture and fixtures on the other. It is immaterial herein whether plaintiff voluntarily delivered the stock of goods, if Ernest Molinar was justified in taking peaceable possession of the former pursuant to the insecurity clause contained in the mortgage. 14 C. J. S. 794. And the jury evidently found that he was. In view of that fact, it is material herein only as to whether or not the keys—the store—was delivered up voluntarily. It does not seem that consulting counsel would, under the circumstances herein, have any tendency to show the contrary. It would seem that if the voluntary delivery of the keys to the store had been deemed of any importance—aside

from the stock of goods—a demand would have been made therefor. And that could have been done at any time, in view of the fact that no consideration was given for the delivery thereof. It would, of course, not have been necessary to make a demand, if tortious possession thereof had been taken. 54 C. J. 448. But courts hold generally that if possession of personal property had been acquired lawfully, a demand for the return thereof is necessary in order to make a defendant liable in an action in replevin or trover and conversion. 54 C. J. 448, 538; 65 C. J. 43, 44. No such demand was made, as plaintiff himself testified. Since he apparently did not consider the possession of the store and furniture and fixtures of any value to him, if he did not have the stock of goods, it ought hardly to be said that Molinar should, nevertheless, have turned these back, without a demand, when the action in replevin was brought. In that action the plaintiff treated the stock of goods on the same level with the store itself and the furniture and fixtures, when he had the right to treat them differently. When the action was brought, all the property was delivered to the sheriff who remained in possession thereof for about a week or ten days, and then returned it to Molinar. No indication was given at any time that plaintiff wanted the return of the store, even in the absence of the return of the stock of goods. We have no reason to think that if the plaintiff had made a demand for the former, it would not have been complied with, since the evidence shows that Molinar had his truck at the store on Saturday morning to haul the stock of goods away, if necessary. Counsel argue that he had no right to turn the keys to the store over to the bank. Aside from other matters, it does not appear that any harm resulted therefrom to the plaintiff. It shows, however, that the defendants made no claim to the furniture and fixtures. It is argued further that

the bank would not have foreclosed on its mortgage, if it had not been for the acts of Ernest Molinar. The witness Bigane, cashier of the bank, indicated that in his testimony. But even if that were so, which at best is conjectural, the defendants could not be held responsible for such foreclosure if their acts, or the acts of their agent, were not unlawful.

■ As recited in the statement of facts, the mortgage here in question provided that if the mortgagee should deem himself insecure, he and his executors, heirs and assigns had the right to declare the principal sum at once due and payable and to enter into and upon any place and take immediate possession of the whole of the property. Counsel for the plaintiff contend that it was necessary as a condition precedent to taking possession of the property to first declare the whole sum due, and they asked the court to give an instruction to that effect, which the court refused to do. No authority sustaining such contention is cited. Counsel would construe the contract to mean that the mortgagee might declare the whole debt due, and *thereupon*, or *thereafter*, take possession, etc. But the italicized words are absent. We are inclined to think that a mortgagee under such mortgage may omit declaring the whole sum due before taking possession. Counsel also argue that the insecurity clause was in favor of Angelo Molinar, his heirs, executors and assigns, and that hence it is limited to these parties, and that Ernest Molinar, as agent for Angelo Molinar, had no right to act thereunder. It is stated in 14 C. J. S. 788 that "an insecurity clause in a mortgage is not a personal covenant, and hence is transferable." If that is correct, a mortgagee may, of course, act through an agent.

■ By instruction No. 6 the court told the jury that "in replevin, as this action was originally commenced, the laws of this state provide that when the property

claimed is not taken, or is returned to the defendant by the sheriff for want of an undertaking required by the statutes, the action may proceed as one for damages only, *and the plaintiff shall be entitled to such damages as are right and proper."* No complaint is made of this instruction, but it is claimed that the other instructions given, some of which limited and some of which fixed the amount of damage which the jury might find, are inconsistent with the italicized portion of instruction No. 6, and that there is "absolute reversible error" on that account. We are unable to follow counsel's argument, and are not certain that we understand what counsel mean. The statement in instruction No. 6 that the plaintiff should recover "such damages as are right and proper" is a general statement. The specific items of damages to which plaintiff might be entitled—which would be right and proper—are determined, of course, by the specific facts in the case and the law applicable thereto, and there would be nothing wrong for the court to give instructions in that connection.

■ Plaintiff asked several instructions substantially to the effect that he was entitled to damage for the destruction of his business. In view of the fact that counsel for plaintiff seem to consider that to be the main item of damage, and argue strenuously that their client's cause was greatly harmed by the refusal of the court to give these instructions, it may not be amiss to discuss the point to some extent, though it is not necessary to do so. Counsel have not, it seems, sufficiently taken into consideration the facts in the case, and have not sufficiently distinguished between the mortgaged property and the store and furniture and fixtures. The taking of the stock of goods would not itself necessarily destroy the business. See Shaw v. Land & Improvement Co., 166 Cal. 257, 135 Pac. 965. If it did, it was by reason of the fact that the plain-

tiff did not have any money or credit with which to buy new goods, and the defendants could hardly be responsible for that (City of Memphis v. Brown, 20 Wall. 289, 22 L. Ed. 266; George R. Barse etc. Co. v. McKinster, 10 Okl. 708, 64 Pac. 14), unless, perchance, the taking of the stock of goods unlawfully would have destroyed that credit, and of that there is no evidence, although counsel for plaintiff claim the contrary. The evidence indicates that his credit had been destroyed previously. It must be clear that giving up the store was the main, or at least partial cause of the destruction of the business. The jury found that plaintiff gave up the store voluntarily, and as already stated, they could hardly have found the contrary. Plaintiff himself, then, was the main, or at least a partial cause for losing his business, and we know of no way by which to apportion the responsibility, if any should be apportioned to defendants. Aside from that, the court did not err in refusing the foregoing instructions for the reason that plaintiff did not, in his petition, ask for any damages for the destruction of his business. He only asked $300 for the interruption thereof. The cases, so far as we have found, in which damages for the destruction of property have been allowed, are cases in which such damages were asked. See for example Sommer v. Yakima Motor Coach Co., 174 Wash. 638, 26 P. (2d) 92; Seeley v. Peabody, 139 Wash. 382, 247 Pac. 471; Johnson Oil Refining Co. v. Elledge, 175 Okl. 496, 53 P. (2d) 543. While not clearly shown, that seems to have been true also in Tootle v. Kent, 12 Okl. 674, 73 Pac. 310. That counsel for the plaintiff were in doubt on the point is shown by the fact that they asked the court at the close of the evidence to permit them to amend their petition, setting forth such damages. It is a well known fact that special damages must be pleaded, in order to be recoverable. Henderson v. Coleman, 19 Wyo. 183, 115 Pac. 439;

54 C. J. 512. In the Henderson case we stated that special damages are the natural but not the necessary consequences of an act. In Robert R. Sizer & Co. v. Dopson, 89 S. C. 535, 72 S. E. 464, the court stated:

"In Loeb v. Mann, 39 S. C. 465, 18 S. E. 1, the court thus states the rule: 'The complaint does not make any claim for special damages, and the circuit judge charged that the case was not one for vindictive damages, so that it must be considered as a plain and ordinary case for the recovery of personal property, and damages for its detention. "To recover damages for the detention of personal property (the property having been delivered), special damage cannot be recovered unless expressly alleged." ' Lipscomb v. Tanner, 31 S. C. 49 (9 S. E. 733). What is this special damage which cannot be proved without being specifically alleged? There is certainly a lack of clearness in the authorities on the subject; but it seems to us that what are called "general damages," as contradistinguished from "special damages," are admitted in evidence under a general allegation—indeed, are inferred by the law itself—for the reason that they are the immediate, direct, and proximate result of the act complained of, as, for instance, an injury done to the property itself, or its value, by detention, etc.; while damages which, although the natural, are not the necessary consequences of the act, being outside of the "costs and disbursements" allowed by law, and consequential in their nature, are not admissible in evidence without special notice of the claim in the allegations of the complaint, and are therefore called "special damages." It is elementary that damages, in the ordinary sense, must be the immediate result of the act complained of.' The same rule was laid down by the Supreme Court of the United States in Vance v. Vandercook, 170 U. S. 468, 18 Sup. Ct. 645, 42 L. Ed. 1111, where it was held that the damages contemplated in such actions are those which result directly from the taking and detention, and cannot include the destruction of business."

The main item, ordinarily at least, in connection with the destruction of business, is the loss of profits. It is stated in 15 Am. Jur. 763 that "as a rule, loss of

business profits must be specially pleaded in tort actions." To the same effect are Sather v. Giaconi, 110 Ore. 433, 220 Pac. 740; Dunham v. Miller, 154 Mo. App. 314, 133 S. W. 675. In Armagost v. Rising, 54 Nebr. 63, 75 N. W. 534, and Agnew v. Johnson, 22 Pa. St. 471, 62 Am. Dec. 303, it was held that damage for interruption of business must be specially pleaded. Loss for destruction of a business would seem to be on the same footing. As already indicated, it may be the natural, but it is not the necessary consequence of the acts of the defendants.

■ Plaintiff complains of other instructions, either given by the court, or refused, relating to the damages recoverable by the plaintiff. We shall not take the time and space to discuss these. It is stated in 5 C. J. S. 1146 that "erroneous instructions as to the measure of damages or amount of recovery do not require reversal where by their verdict the jury show that they were not misled, and no prejudice has resulted to the complaining party." That is true where the jury find for the defendant on the main issue. 5 C. J. S. 1148. And in 5 C. J. S. 1149, note, it is stated that "error in instructing on the measure of damages is not ground for reversal, where the jury find that no liability existed." In the case at bar, the jury found in favor of the defendants. That means that they found that defendants did not unlawfully take or detain any of plaintiff's property. When they decided that, the question of damages to the plaintiff, and the instructions relating thereto, became immaterial. Baird v. Bureman, 138 Kans. 381, 26 P. (2d) 272. It would, of course, be different, if the jury had found any damages in favor of plaintiff, and it is strenuously argued that, while finding in favor of the defendants they failed to bring in a verdict for the executors for the balance due on the note, as claimed in the cross-petition (under form E), and that this failure may be construed as

equivalent to a finding of damages in favor of the plaintiff equal to the amount still due on the note, but that if that is not true, then the verdicts as returned are so confusing that a new trial should be granted. In some cases doubtless a general verdict in favor of defendant may be construed as offsetting the claim made by him against the claim made by the plaintiff (64 C. J. 1108), but the intent to that effect should be reasonably clear, and as stated in Godefroy v. Reilley, 140 Wash. 650, 250 Pac. 59, so in this case "it would be a perversion of that intent and an injustice to the respondents" to construe the verdict returned as a verdict for the other party. It seems to be clear in this case that the jury did not intend to find anything in favor of the plaintiff. The court instructed the jury: "In case you find for the defendant Ernest Molinar, then you may use form C. herewith submitted to you." The jury followed the instruction, finding "We the jury, duly impannelled * * * find the defendant Ernest Molinar not liable for any damages in this case." The court further instructed the jury: "In case you find in favor of the defendants * * * executors * * * you may use form D." The jury followed that instruction, finding: "We the jury duly impanelled * * * * do find in favor of the defendants * * executors * * and against the plaintiff Henry Hein on the issues joined." These verdicts can hardly be misunderstood. They are clear-cut in favor of the defendants in the case and against the plaintiff. The court further instructed the jury that if they should find in favor of the executors, and further found that plaintiff is still indebted to them on the cross-petition, they might use form E, filling in the amount still due. The jury failed to sign this form. It might well have been combined with form D, but the trial court for some reason thought best not to do so, and apparently thought that even though the jury should bring in a verdict in favor of

the defendants as against the claims of the plaintiff, the evidence did not necessarily compel the jury to bring in a verdict on the amount still due on the note mentioned in the cross-petition. On its face, the fact that the jury failed to sign and return form E, and thus failed to give the executors anything for the amount still due on the note is of benefit to the plaintiff, of which he could not ordinarily complain. The failure of the jury to sign this form may be explained in various ways. They may have simply neglected to do so because it was a minor issue in the case. They may have failed to return it out of sympathy for the plaintiff, or, since the plaintiff was insolvent, may have thought it a useless thing to do. In any event we are unable to see how this fact can be construed as a finding in favor of the plaintiff on the claims which he made in his petition. If counsel thought that the action of the jury left their findings as a whole obscure, they might have objected at the time of the return of the verdicts. They did not do so. They did not raise the point in the motion for judgment notwithstanding the verdict, nor in their assignments of error. It is too late now. See Innes v. Hay, 28 Wyo. 274, 203 Pac. 1091; 64 C. J. 1110.

■ Fourteen assignments of error relate to the reception or exclusion of evidence. Two of them relate to the exclusion of answers to the questions as to what the business of plaintiff was worth. Plaintiff, however, was permitted to show his profits, his income, and his outlay, from which the value might be determined. Furthermore, the questions had a bearing only on the destruction of plaintiff's business, for which no damages were asked in the petition. Most of the questions asked, and permitted, or not permitted to be answered, were of little importance. At least some of the rulings of the court were right. We have carefully considered all of the assignments of error. It would not subserve

any good purpose to refer to them in detail. We do not think that we can say that there was any prejudicial error in any of the rulings of the court.

A careful examination of the record has convinced us that the plaintiff had a fair and impartial trial, and he was permitted to produce evidence on all of the controlling questions in the case at great length. Some other points, minor in character, are argued. We have considered them carefully. We find no reversible error in the record, and the judgment herein must be affirmed.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.